## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| James Lieffring,<br><br>    Plaintiff,<br><br>v.<br><br>Prairieland Solid Waste Facility, County of Martin, and County of Faribault,<br><br>    Defendants. | Case No. 19-cv-02812 (SRN/TNL)<br><br><br>**ORDER** |

Areti Georgopoulos, Harmony Law Firm PLLC, 310 Fourth Avenue South, Suite 5010, Minneapolis, MN 55415; and Heather M. Gilbert, Gilbert Law PLLC, 4856 Banning Avenue, St. Paul, MN 55110, for Plaintiff.

Ryan P. Myers and Timothy P. Jung, Lind Jensen Sullivan & Peterson, PA, 901 Marquette Avenue South, Suite 1300, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion for Summary Judgment [Doc. No. 27] filed by Defendants. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **DENIES** the motion.

## I. BACKGROUND

In April 1989, Martin County and Faribault County (collectively, "the Counties") entered into a Joint Powers Agreement pursuant to Minnesota Statutes § 471.59. (*See* Decl. of Ryan P. Myers ("Myers Decl.") [Doc. No. 30], Ex. 5 ("JPA").) The Agreement created the Prairieland Solid Waste Board ("Prairieland"), an entity tasked with meeting the solid waste disposal needs of the Counties and their residents. Under the Joint Powers

Agreement and Prairieland's bylaws, Prairieland is governed by a Board of Directors, a ten-member body composed of each County's set of five commissioners, and the Prairieland Director, an individual appointed by the Board and tasked with overseeing Prairieland's daily operations. (*See id.* § II.A; Myers Decl., Ex. 7 ("Prairieland Bylaws"), art. IV; Decl. of Areti Georgopoulos ("Georgopoulos Decl.") [Doc. No. 36], Ex. 4 ("Rabbe Dep."), at 18-21.)

The Agreement required the Counties to pay the "[c]ompensation and other expenses" of the Prairieland Board.[1] (JPA § II.A.) In addition, the Agreement required the Counties to jointly fund the development of Prairieland's facilities, and split Prairieland's operating costs and revenue between them. (*Id.* § I.C.) However, Prairieland's current Director, Billeye Rabbe, testified that Prairieland's operating budget is fully funded by tipping fees paid by commercial garbage haulers and individuals who dump refuse at Prairieland's facilities. (Rabbe Dep. at 64-66.) The Prairieland Board is empowered to hire, fire, and pay employees.[2] (JPA § II.B; Prairieland Bylaws art. IV, sec. III.) Strikingly, the

---

[1] The record is unclear regarding whether the commissioners actually received separate compensation for their work on the Prairieland Board. Although the Joint Powers Agreement required the Board's compensation to be paid by the Counties, Prairieland's bylaws provide that the Board "shall not be entitled to compensation of [sic] services performed except that they may be reimbursed for expenses incurred in the performance of their duties." (Prairieland Bylaws art. V, sec. III.) Nevertheless, at its Rule 30(b)(6) deposition, Martin County testified that its commissioners are entitled to a $75 per diem reimbursement, paid by Prairieland, for work on the Prairieland Board. (*See* Georgopoulos Decl., Ex. 2 ("Martin Cty. Dep."), at 61-65.)

[2] Notably, the record indicates that, prior to 1991, Prairieland employees were paid by and received health insurance benefits through Martin County. (*See* Decl. of Kathryn Grunig ("Grunig Decl.") [Doc. No. 40].)

Joint Powers Agreement also grants the Prairieland Board authority to "assign tasks . . . to any staff member or members of any County," and provides that "[c]ompensation and payment of expenses of such staff member or members shall continue to be the responsibility of the County which regularly employs the staff member or members, unless otherwise determined by the [Prairieland Board]." (JPA § II.B.)

Although the Counties' commissioners typically manage Prairieland business at a meeting of the Prairieland Board, the record indicates that, on at least one occasion, the Prairieland Board's members conducted Prairieland business at the Counties' separate commissioner meetings. (*See* Rabbe Dep. at 155-56 (testifying that, when the Prairieland Board was unable to meet in May 2018, Rabbe sought authorization to pay Prairieland's bills at the Counties' respective commissioner meetings); Georgopoulos Decl., Ex. 24.) Prairieland maintains its own personnel policy manuals, has its own federal employer identification number, and holds its own bank accounts. (*See* Rabbe Dep. at 40-41, 104; Myers Decl., Ex. 13.) There is no provision in either the Joint Powers Agreement or Prairieland's bylaws requiring Prairieland to indemnify the Counties for its actions.

In 2005, the Counties amended the Joint Powers Agreement to authorize Prairieland to serve as the Solid Waste Coordinator for each County. (*See* Myers Decl., Ex. 8.) Each County's Solid Waste Coordinator administers the county's solid waste collection programs, which are funded by a tax assessed on county residents. (*See* Rabbe Dep. at 16-20, 64-66.) In 2013, Billeye Rabbe was appointed as both Prairieland's Director and to the Solid Waste Coordinator position for each county. (*Id.* at 16-20.) Rabbe performs many of her duties as Solid Waste Coordinator from her office at Prairieland. (*Id.*) In her capacity

as Prairieland Director, Rabbe reports to both Counties' commissioners together at Prairieland Board meetings; in her capacity as Solid Waste Coordinator, she reports separately to each County's commissioners.[3] (*Id.* at 54.) When she was appointed to these positions, at the Prairieland Board's request, Rabbe created a salary proposal. (*Id.* at 29; Georgopoulos Decl., Ex. 23.) Under the proposal, which was accepted by the Board, Prairieland was to be responsible for 50% of Rabbe's salary, and the Counties were to be collectively responsible for 50% of her salary. (Rabbe Dep. at 29; Georgopoulos Decl., Ex. 23.) In practice, Prairieland pays Rabbe's full salary, and the Counties then reimburse Prairieland for their share of the salary. (Rabbe Dep. at 29.)

In 2016, Prairieland and Martin County entered into a Joint Powers Agreement, under which Martin County agreed to administer Prairieland's employee benefits in exchange for a $9,111.43 administrative fee. (Rabbe Dep. at 66-68; Martin Cty. Dep. at 108-09; Myers Decl., Ex. 9 ("Prairieland-Martin Cty. JPA").) The record suggests that, prior to the 2016 Agreement, Martin County had provided health insurance benefits directly to Prairieland employees, without charging an administrative fee. (*See* Grunig Decl.; Martin Cty. Dep. at 108-11.) The 2016 Agreement expressly provided that "Prairieland employees are not considered County employees for any purpose despite participating in any of [sic] health insurance or ancillary benefits being provided pursuant to this Agreement." (Prairieland-Martin Cty. JPA ¶ 5.)

---

[3] The record is unclear whether Rabbe has ever discussed Solid Waste Coordinator issues at meetings of the Prairieland Board.

Plaintiff James Lieffring joined Prairieland as a full-time Production Worker in 2001. (Georgopoulos Decl., Ex. 1 ("Lieffring Dep."), at 13.) Prairieland's Production Workers are tasked with, in essence, operating equipment, cleaning, and working on the facility's tipping floor. (*See* Georgopoulos Decl., Ex. 4 ("Langvardt Dep."), at 13; *id.*, Ex. 25; Lieffring Dep. at 20.) Beginning in April 2017, Prairieland implemented a rule prohibiting employees from taking beverages onto the tipping floor. (Rabbe Dep. at 107-08; Myers Decl., Ex. 15.) Despite this rule, Lieffring took coffee onto the tipping floor on several occasions, leading to a verbal warning in June 2017 and a written warning in October 2017. (*See* Myers Decl., Ex. 15.)

In November 2017, Lieffring experienced a mesenteric artery blockage necessitating emergency medical care and a lengthy hospitalization. (*See* Lieffring Dep. at 29-30.) The following month, Lieffring discussed his medical condition with Rabbe and Kathryn Grunig, Prairieland's Office Manager, and was told that the only leave available to him was accrued vacation or sick leave. (Decl. of James Lieffring [Doc. No. 41], at ¶¶ 3-5.) Lieffring therefore used accrued sick leave benefits during his absence from work. (Lieffring Dep. at 33.) When Lieffring was released from the hospital in December 2017, his doctor imposed a ten-pound lifting restriction for six weeks. (Georgopoulos Decl., Ex. 28.) Although Lieffring sought to return to work, Rabbe refused to permit him to return, noting that his position as a Production Worker required him to be able to lift at least 35 pounds. (Lieffring Dep. at 31-33; Rabbe Dep. at 90-92.) Lieffring consulted with his doctor, who increased the lifting restriction to 36 pounds, and Lieffring returned to work on January 2, 2018. (Lieffring Dep. at 33; Rabbe Dep. at 91-92.) Lieffring testified that he

returned "on a lighter duty," and did not lift more than 36 pounds, climb, or do "anything real strenuous." (Lieffring Dep. at 35-36.)

On January 30, 2018, while checking on trash compactors outside the building, Lieffring slipped and fell on a patch of ice, injuring his left shoulder. (*Id.* at 36-37.) He reported his injury to Kirk Langvardt, the Plant Supervisor, and completed an accident report with Langvardt the next day. (*Id.*; Myers Decl., Ex. 19.) Lieffring sought medical treatment, and Prairieland filed a First Report of Injury with its workers' compensation insurer. (Lieffring Dep. at 40-42; Myers Decl., Exs. 21-22.) On February 5, Lieffring received an additional evaluation of his shoulder, and his doctor imposed a 26 to 40-pound lifting restriction. (Myers Decl., Ex. 23.) Because Lieffring could lift more than 35 pounds, Prairieland permitted him to continue working. (Rabbe Dep. at 104-05.)

On February 19, Rabbe met with Lieffring and Langvardt to discuss her observation that Lieffring continued to bring coffee onto the tipping floor, as well as "leav[e] early, watch[] other employees work and not perform[] his job." (*Id.* at 115.) Rabbe discussed her concerns with Langvardt, who she testified worked with Lieffring more closely than she did. (*Id.* at 115-16.) Langvardt did not share Rabbe's concerns regarding Lieffring's behavior, and testified that he "didn't know that she was upset about his work performance or his coffee drinking or anything else. It just kind of blind-sided me." (*Id.* at 115-19; Langvardt Dep. at 51-53.) Following this meeting, Rabbe suspended Lieffring for two weeks. (Myers Decl., Ex. 24.) Sometime prior to Lieffring's suspension, Rabbe discussed terminating Lieffring with the Prairieland Board. (Rabbe Dep. at 157.) At that meeting, Rabbe discussed her concerns with Lieffring's performance and asked the Board for "some

direction on if this was grounds for termination." (*Id.* at 157-58.) The Board voted to terminate Lieffring, but advised Rabbe to first seek guidance from counsel. (*Id.* at 158-60.) Rabbe disclosed to the Board that Lieffring had experienced a work-related injury. (*Id.* at 160.)

Lieffring was diagnosed with a complete rotator cuff injury, which appeared to be irreparable. (Georgopoulos Decl., Exs. 37-38.) On February 19, as a result of a February 14 MRI scan, Lieffring's doctor recommended "that he be off work at this time. It is unknown how long he will be off work." (Myers Decl., Ex. 25.) Lieffring began receiving temporary total disability benefits through Prairieland's workers' compensation insurer on February 19. (*See* Georgopoulos Decl., Ex. 42.) On February 28, Lieffring's doctor revised his restrictions, permitting him to return to work with the following restrictions, effective for ten weeks:



Functional Abilities: In a ___ hour shift a person may
Restrictions (No restrictions unless marked)
Number of Hours Permitted to Work per Day ___  Number of Days per Week ___  ☐ No Rotating Shifts  ☐ Other (Specify) _____

| Employee Can:<br>Blank = Not Restricted | Not at All | Rare<br>(Less Than 5%) | Occasional<br>(6–33%) | Frequent<br>(34–66%) | Other Restrictions: |
|---|---|---|---|---|---|
| Sit | ☐ | ☐ | ☐ | ☑ | ☐ No driving work vehicles |
| Stand/Walk | ☐ | ☐ | ☐ | ☑ | ☐ No working alone |
| Twist/Turn | ☐ | ☐ | ☐ | ☑ | ☐ No direct patient care |
| Bend/Stoop | ☐ | ☐ | ☑ | ☐ | ☐ No operating power equipment |
| Squat/Kneel/Crawl – *no kneeling* | ☐ | ☑ | ☐ | ☐ | ☐ No working at heights or where abrupt incapacity could |
| Climb (Ladder/Stairs) | ☑ | ☐ | ☐ | ☐ | be hazardous |
| Reach Above Shoulders ☑L ☐R | ☑ | ☐ | ☐ | ☐ | ☐ Keep the wound site clean and dry |
| Reach At or Below Shoulders ☑L ☐R | ☐ | ☑ | ☐ | ☐ | ☐ No assaultive/physical control situations |
| Repetitive Grasp/Pinch ☑L ☐R | ☐ | ☐ | ☑ | ☐ | ☐ No temperature extremes (Less than 52F or greater than 80F) |
| Work With Hand/Arm ☑L ☐R | ☐ | ☑ | ☐ | ☐ | ☐ Environmental (Specify) |
| Fine Manipulation ☐L ☐R | ☐ | ☐ | ☐ | ☐ | ☐ No work in patient's environment |
| Vibratory Tasks ☐L ☐R | ☐ | ☐ | ☐ | ☐ | ☐ No latex products |
| Keyboarding ☐L ☐R | ☐ | ☐ | ☐ | ☐ | ☐ Other |
| Lift/Carry ☑L ☐R | ☑ 5 lbs☐ | ___ lbs☐ | ___ lbs | | |
| Push/Pull ☐L ☐R | ☐ ___ lbs☐ | ___ lbs☐ | ___ lbs | | |

Other Instructions/Limitations
*Pt cannot lift @ arm away from body*

(*Id.*, Ex. 35.) The revised restrictions noted that Lieffring "cannot lift [left] arm away from body," and could only lift or carry five pounds with his left arm. (*Id.*) However, those restrictions extended only to his left arm. (*Id.*) Both Lieffring and Langvardt testified that Lieffring could perform the essential functions of his job even with these restrictions.[4] (Lieffring Dep. at 86-89; Langvardt Dep. at 50-61.) Indeed, Langvardt testified that he had "always tried finding light duty work for guys that need it, that were hurt and needed to get back to work." (Langvardt Dep. at 51.) As one example, Langvardt testified that he had permitted an employee to sweep and sharpen drill bits for two weeks as the employee recovered from kidney surgery. (*Id.* at 54.)

Nonetheless, once Lieffring's suspension expired, Rabbe refused to permit Lieffring to return to work "until he's 100 percent." (*Id.* at 60.) At her deposition, Rabbe admitted that she never discussed Lieffring's February 28 lifting restrictions, or Prairieland's ability to accommodate them, with Lieffring. (Rabbe Dep. at 176.) Instead, Prairieland permitted Lieffring to use accrued sick and vacation benefits to supplement his workers' compensation benefits. (Myers Decl., Ex. 28.) When Lieffring exhausted his accrued leave, Prairieland terminated his employment. (*See id.*, Ex. 30.) Prairieland's separation letter, dated May 11, 2018, stated in full:

> On May 8, 2018 you exhausted your sick and vacation balances. Attempts to reach you have not been successful. Since you are not on paid status, have

---

[4] Langvardt's testimony is at odds with Rabbe's, who testified that both she and Langvardt "were on the same page" that Lieffring was "not . . . able to perform production work duties." (Rabbe Dep. at 139.) However, Langvardt testified that when he discussed Lieffring's February 28 restrictions with Rabbe, he did not agree with her assessment that the restrictions prevented Lieffring from returning to work. (Langvardt Dep. at 63.)

not applied for a leave of absence and have not contacted me with regard to your status, you are considered to have been absent without leave at this time. Accordingly, you are separated from employment at Prairieland Solid Waste Management effective today May 11, 2018. Your insurance will be continued until the end of May. You will receive a separate communication regarding continuation of health insurance.

(*Id.*) Lieffring testified that he did not discuss his ability to return to work with anyone from Prairieland in the weeks leading to his termination; however, he visited the workplace regularly to sign his paystubs, and Rabbe did not attempt to speak with him about his restrictions or what would happen when he exhausted his accrued leave, either. (*See* Lieffring Dep. at 67, 80; Rabbe Dep. at 168-69, 176 (testifying that Rabbe did not make any attempt to contact Lieffring, and that the attempts referenced in the separation letter referred to the workers' compensation insurer's attempts to reach Lieffring).)

On May 1, 2018, prior to Lieffring's termination, Prairieland's workers' compensation insurer issued a Notice of Intention to Discontinue Workers' Compensation Benefits ("NOID"). (Georgopoulos Decl., Ex. 41.) The NOID stated that "[t]he employer and the insurer are in receipt of additional information which indicate [sic] the employee did not sustain a work injury as claimed by him on 1/30/2018." (*Id.*) The NOID specifically referenced photos taken by Rabbe shortly after Lieffring's fall: "The employer took pictures of the area of employee's fall and saw foot prints only in the snow but no imprint of the employee's fall. No snow mound was visible from which the employee claims he fell." (*Id.*) However, the photos submitted by Rabbe to the insurer were only a subset of the photos taken after Lieffring's fall, and none of them depicted the area between the trash compactors where Lieffring fell. (*See* Georgopoulos Decl., Ex. 31, at 44-47; *id.*, Ex. 32, at

2.) Lieffring contested the denial of workers' compensation benefits, and ultimately prevailed in the workers' compensation system. (*See* Myers Decl., Ex. 35.)

Lieffring brought suit against Prairieland and the Counties under the Family and Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), the Minnesota Human Rights Act ("MHRA"), and Minnesota's Workers' Compensation Act ("WCA"). Lieffring alleges that Prairieland and the Counties failed to offer him FMLA leave. In addition, Lieffring asserts disability discrimination, retaliation, and failure-to-accommodate claims against Prairieland under the ADA and the MHRA. And Lieffring alleges that Prairieland obstructed his workers' compensation claim and retaliated against him for seeking workers' compensation benefits. Defendants now move for summary judgment on all claims.

## II.     DISCUSSION

### A.     Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## B.    Analysis

Defendants seek summary judgment on three grounds. First, Defendants argue that Prairieland is a separate entity from the Counties, and that Prairieland therefore does not have a sufficient number of employees to trigger the requirements of the FMLA, the ADA, or the MHRA. Second, with respect to Lieffring's ADA and MHRA claims, Defendants contend that Lieffring's lifting restrictions rendered him unable to perform the essential functions of his job. And finally, Defendants assert that Lieffring has not raised a genuine factual dispute regarding the causal connection between his workers' compensation claim and his suspension, Prairieland's refusal to permit him to return to work, or his termination. The Court will analyze each argument in turn.

### 1.     Coverage Under the FMLA, the ADA, and the MHRA

The FMLA generally applies to all public agency employers, regardless of the number of persons employed by the agency. *See* 29 U.S.C. § 2611(4)(A)(iii); 29 C.F.R. § 825.104(a). However, only "eligible employees" may obtain the statute's benefits. The statute provides that, among other requirements, an eligible employee is one whose employer has 50 employees within 75 miles of the worksite. *See* 29 U.S.C. § 2611(2); 29 C.F.R. § 825.108(d) ("[E]mployees of public agencies must meet all of the requirements of eligibility, including the requirement that the employer (e.g., State) employ 50 employees at the worksite or within 75 miles."). Thus, Lieffring can prevail on his FMLA claim only if Prairieland meets the 50-employee threshold. Similarly, the ADA and the MHRA apply only if Prairieland employed 15 or more employees. *See* 42 U.S.C. § 12111(5)(A) ("The term 'employer' means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year . . . ."); Minn. Stat. § 363A.08, subd. 6 ("[I]t is an unfair employment practice for an employer with a number of part-time or full-time employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year . . . equal to or greater than 15 . . . not to make reasonable accommodation to the known disability of a qualified disabled person . . . .").

It is undisputed that Prairieland employed fewer than 15 persons during the relevant time period, and that the FMLA, the ADA, and the MHRA apply if and only if Prairieland's employees may be counted together with one or both Counties' employees. Lieffring contends that Defendants' employees may be counted together under the "joint employer"

and "integrated employer" doctrines.[5] In their initial memorandum in support of their motion, Defendants argued that, applying these doctrines, Lieffring has not raised a genuine factual dispute supporting the conclusion that Prairieland and the Counties are joint or integrated employers. In their reply memorandum, Defendants raised the additional argument that the joint and integrated employer doctrines do not apply under the FMLA where the employer is a public agency.[6]

The Court finds that the joint and integrated employer doctrines are available to a plaintiff employed by a public agency. Defendants' arguments to the contrary rest on an overly restrictive reading of the Department of Labor's regulations implementing the FMLA. Those regulations provide that:

> Normally the legal entity which employs the employee is the employer under FMLA. Applying this principle, <u>a corporation</u> is a single employer rather than its separate establishments or divisions.
>
>> (1) Where <u>one corporation</u> has an ownership interest in another corporation, it is a separate employer unless it meets the joint employment test discussed in § 825.106, or the integrated employer test contained in paragraph (c)(2) of this section.

---

[5] Lieffring also contends that the Joint Powers Agreement did not establish Prairieland as a separate legal entity from the Counties, relying largely on language in the Agreement that refers to Prairieland as a "project." But the Agreement also refers to Prairieland as an "organization," and the record demonstrates that Prairieland has operated as a legal entity—by, for example, hiring its own employees, obtaining its own federal employer identification number, and holding its own bank accounts. (*See* JPA §§ I.B, II.B; Rabbe Dep. at 40-41, 104.) The question, therefore, is not whether Prairieland is a separate legal entity, but whether the applicable statutes permit counting Prairieland's employees together with those of the Counties.

[6] Defendants do not appear to argue that the joint and integrated employer tests are inapplicable to public agencies under the ADA and the MHRA.

> (2) <u>Separate entities</u> will be deemed to be parts of a single employer for purposes of FMLA if they meet the integrated employer test. Where this test is met, the employees of all entities making up the integrated employer will be counted in determining employer coverage and employee eligibility. . . .

29 C.F.R. § 825.104(c) (emphasis added). Section 825.106, in turn, specifically addresses the "joint employer" test:

> Where two or more <u>businesses</u> exercise some control over the work or working conditions of the employee, the <u>businesses</u> may be joint employers under FMLA . . . .

*Id.* § 825.106(a) (emphasis added).

Defendants argue that these regulations suggest that the joint and integrated employer tests apply only to "corporations" and "businesses," not to public agencies. Defendants' argument finds some support in the case law. The regulations contain a section dedicated to the FMLA's application in the public agency context. Prior to 2008, that section stated that:

> A State or a political subdivision of a State constitutes a single public agency and, therefore, a single employer for purposes of determining employee eligibility. For example, a State is a single employer; a county is a single employer; a city or town is a single employer. <u>Where there is any question about whether a public entity is a public agency, as distinguished from a part of another public agency, the U.S. Bureau of the Census' "Census of Governments" will be determinative,</u> except for new entities formed since the most recent publication of the "Census."

*Id.* § 825.108(c)(1) (effective prior to 2008) (emphasis added). In *Rollins v. Wilson County Government*, the Sixth Circuit interpreted this regulation as establishing a two-part test applicable where a plaintiff seeks to aggregate the number of employees employed by public agencies. 154 F.3d 626 (6th Cir. 1998). Based on the regulation's "[w]here there is

any question" language, the court held that courts must first determine whether state law definitively resolves the question of whether two public agencies are separate. *Id.* at 629. If state law does not provide a definitive answer, the court reasoned that, under the regulation's language, the Census of Governments is "determinative." *Id.* In light of *Rollins'* reasoning, some district courts subsequently concluded that the two-part *Rollins* test, and not the joint or integrated employer doctrines, applies to FMLA claims against public agencies. *See, e.g.*, *Colter v. Bowling Green-Warren Cty. Reg'l Airport Bd.*, No. 1:17-CV-00118-JHM, 2017 WL 5490920 (W.D. Ky. Nov. 15, 2017); *Miller v. Cty. of Rockingham*, No. 5:06-CV-00053, 2007 WL 2317434, at *7 (W.D. Va. Aug. 9, 2007) ("The Counties persuasively argue that neither [the joint nor integrated employer] test should be applied in this case, given the fact that there is a separate regulation pertaining to public agencies.").

But the reasoning of the *Rollins* court, as well as the *Colter* and *Miller* courts, rested on the regulation's treatment of the Census as "determinative." In 2008, the Department of Labor amended the regulation to recognize that "[w]hether two agencies of the same State or local government constitute the same public agency can only be determined on a case-by-case basis." 29 C.F.R. § 825.108(c)(1). Rather than treating the Census as "determinative," the regulation now treats the Census as but "[o]ne factor that would support a conclusion that two agencies are separate." *Id.* In a January 2020 opinion letter, the Department of Labor explained that the regulation was revised to make the Census "just one factor," consistent with the Fair Labor Standards Act, and to "allow[] employment-related factors to play a greater role." Wage & Hour Div., U.S. Dep't of Labor,

FMLA2020-1-A, Opinion Letter Fair Labor Standards Act, 2020 WL 122923, at *2 n.2 (Jan. 7, 2020) [hereinafter "2020 Opinion Letter"]. Such factors include: "(1) whether the two agencies have separate payroll systems; (2) whether they have different retirement systems; (3) whether they have separate budgets and funding authorities; (4) whether each has the authority to sue and be sued in its own name; (5) whether they have separate hiring and other employment practices; (6) whether one employer controls the appointment of officers of the other agency; and (7) how state law treats the relationship between the two agencies." *Id.*

The Court reads the public agency test described in the current regulation and the 2020 Opinion Letter as a statement of additional factors that courts should consider in determining whether two public agencies are "integrated employers." Nothing in the regulations suggests that the integrated employer factors outlined in 29 C.F.R. § 825.104(c)(2) are inapplicable to public agencies. Indeed, both before and after the Department of Labor's 2008 revisions, courts have applied the integrated employer test in public agency cases. *See Braden v. Cty. of Washington*, 749 F. Supp. 2d 299, 307 (W.D. Pa. 2010) (applying both the *Rollins* test and the integrated employer test, and declining to determine whether the *Rollins* test is the only test applicable in the public agency context); *Nielson v. Port of Gold Beach*, No. CV 05-3095-PA, 2007 WL 2363302, at *2 (D. Or. Aug. 16, 2007) (same). Both the public agency test and the integrated employer doctrine serve to resolve whether two legal entities ought to be considered the same entity for purposes of the FMLA's coverage requirements. *See* 29 C.F.R. § 825.104 ("Separate entities will be deemed to be parts of a single employer for purposes of FMLA if they meet the integrated

employer test."); *id.* § 825.108(c)(1) ("Whether two agencies of the same State or local government constitute the same public agency can only be determined on a case-by-case basis."). The regulations' public agency provision, in essence, identifies additional factors that speak to whether two public agencies are one integrated employer.

In addition, the Court is not persuaded that the joint employer test is categorically inapplicable where the employer is a public agency. Defendants emphasize that the regulations phrase the test in terms of "corporations" and "businesses," as opposed to "entities"—as used in the integrated employer provision. *See id.* §§ 825.104(c)(1), 825.106. But courts, both before and after the Department of Labor's 2008 revisions, have applied the joint employer test to public agencies in the FMLA context. *See Porter v. New Age Servs. Corp.*, No. 10 C 1784, 2011 WL 1099270, at *4 (N.D. Ill. Mar. 22, 2011), *aff'd*, 463 F. App'x 582 (7th Cir. 2012) (analyzing a joint employer theory under the FMLA in the public agency context); *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, No. 04-1169, 2006 WL 3842086, at *7 (C.D. Ill. Dec. 29, 2006), *aff'd*, 536 F.3d 640 (7th Cir. 2008) (analyzing whether a private employer, city, and county jointly employed the plaintiff under the FMLA). Defendants do not persuasively explain why private employers can be regarded as joint employers of an employee, while public employers cannot.

Accordingly, the Court finds that the joint and integrated employer doctrines are available to Lieffring. Under the joint employer doctrine, courts evaluate the economic realities of the relationship between the employee and the alleged joint employer, and generally consider whether the alleged joint employer "(1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of

employment; (3) determined the rate and method of payment; and (4) maintained employment records." *Catani v. Chiodi*, No. CIV.00-1559 (DWF/RLE), 2001 WL 920025, at *6 (D. Minn. Aug. 13, 2001) (citing *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)). Under the integrated employer doctrine, courts generally consider (1) the interrelation between the entities' operations, (2) common management, (3) centralized control of the entities' labor relations, and (4) common ownership. *See Radio & Television Broad. Technicians Loc. Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965); 29 C.F.R. § 825.104(c)(2). Both tests are fact-intensive, and look to the totality of the circumstances.

In the public agency context, the Department of Labor's FMLA regulations add several additional factors to the integrated employer test. Such factors include: "(1) whether the two agencies have separate payroll systems; (2) whether they have different retirement systems; (3) whether they have separate budgets and funding authorities; (4) whether each has the authority to sue and be sued in its own name; (5) whether they have separate hiring and other employment practices; (6) whether one employer controls the appointment of officers of the other agency; and (7) how state law treats the relationship between the two agencies," as well as treatment of the agency by the Census of Governments. 2020 Opinion Letter at *2; *see* 29 C.F.R. § 825.108(c)(1).

Applying those tests, the Court finds that Lieffring has raised a genuine factual dispute precluding summary judgment in Defendants' favor. It is true that Prairieland has, in many ways, operated as its own entity, independent of the Counties. Prairieland maintains its own bank accounts, hires, fires, and pays its own employees, maintains its

own personnel policy manuals, has its own federal employer identification number, and financially supports its operations through tipping fees. (JPA § II.B; Prairieland Bylaws art. IV, sec. III; Rabbe Dep. at 40-41, 64-66, 104; Myers Decl., Ex. 13.) Moreover, the Joint Powers Agreement does not require Prairieland to indemnify the Counties for its conduct. And Prairieland is identified as a separate public agency in the Census. (*See* Myers Decl., Ex. 38.)

But Prairieland is also closely tied to the Counties, in several important respects. First, the Prairieland Board is composed exclusively of the Counties' commissioners. Although the Prairieland Director is hired by the Board to manage day-to-day operations, the Director is not a member of the Board, as might support a greater degree of separation between the entities. (*See* JPA § II.A; Prairieland Bylaws art. IV; Rabbe Dep. at 18-21.) In addition, even though the record suggests that Prairieland's budget is fully supported by tipping fees paid to Prairieland—and not taxes collected by the Counties—the Joint Powers Agreement obligates the Counties to pay for the development of Prairieland's facilities and split Prairieland's operating costs and revenue. (JPA § I.C; Rabbe Dep. at 64-66.) Strikingly, the Agreement also empowers the Prairieland Board to "assign tasks . . . to any staff member or members" of the Counties, the compensation and expenses of that staff member to be borne by the County. (JPA § II.B.) Although the record does not reflect an example of the Board exercising this power, the power to co-opt County employees strongly supports a joint or integrated employer relationship.

Moreover, the Board's compensation—had the Board not disclaimed compensation in Prairieland's bylaws—would be paid by the Counties, not Prairieland. (*Id.* § II.A; *see*

Prairieland Bylaws art. V, sec. III.) Yet, in fact, Martin County's commissioners do receive a $75 per diem reimbursement for their work on Prairieland's Board. (Martin Cty. Dep. at 61-65.) Although the Joint Powers Agreement would suggest that the Counties are obligated to make that payment, Martin County testified that Prairieland pays the per diem. (*Id.*) Relatedly, Director Rabbe serves in the nominally separate roles of Prairieland Director and Solid Waste Coordinator for the Counties. But Prairieland pays Rabbe's entire salary, including the portion of her salary attributable to her work as Solid Waste Coordinator; the Counties then "reimburse" Prairieland for half of Rabbe's salary. (Rabbe Dep. at 29; Georgopoulos Decl., Ex. 23.) In addition, prior to 1991, Prairieland's employees were paid by and received health insurance benefits through Martin County. (*See* Grunig Decl.) While Prairieland subsequently took on its own payroll obligations, it continued to offer employment benefits through Martin County, and did not formalize Martin County's role as a paid plan administrator until 2016. (*See* Rabbe Dep. at 66-68; Martin Cty. Dep. at 108-11; Prairieland-Martin Cty. JPA.) Finally, the record reflects at least one occasion where the Counties' commissioners acted on Prairieland business in their separate commission meetings, rather than at a meeting of the full Prairieland Board. (*See* Rabbe Dep. at 155-56; Georgopoulos Decl., Ex. 24.)

In short, although Prairieland and the Counties are largely separate on paper, the record contains ample facts suggesting that their management and operations are sufficiently enmeshed to support the conclusion that they are joint or integrated employers under the FMLA, the ADA, and the MHRA. Accordingly, the Court finds that a triable issue of fact exists, and denies Defendants' Motion for Summary Judgment on this basis.

### 2. Lieffring's Ability to Perform the Essential Functions of His Job

The Court next considers Defendants' argument that Lieffring's February 28, 2018 lifting restrictions prevented him from performing the essential functions of his job. A plaintiff may prevail on disability discrimination, retaliation, and failure-to-accommodate claims, under both the ADA and the MHRA, only if the plaintiff is able to perform the essential functions of his job, with or without reasonable accommodation. *See Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002) ("An ADA claimant must make a *prima facie* showing that he (1) has a disability within the meaning of the ADA, (2) is able to perform the essential functions of the job, with or without reasonable accommodation, and (3) suffered an adverse employment action as a result of the disability." (citation omitted)); *Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 924 (8th Cir. 2018) (affirming grant of summary judgment for employer on employee's ADA failure-to-accommodate and retaliation claims where the employee failed to show that he could perform the essential functions of his job); *Collins v. Abbott Lab'ys, Inc.*, 972 F.3d 976, 978 (8th Cir. 2020) (affirming grant of summary judgment for employer on employee's MHRA claims where employee failed to make "a facial showing that reasonable accommodation is possible and that the accommodation will allow [him] to perform the essential functions of the job" (quotation omitted)). Defendants contend that Lieffring's February 28 work restrictions, which provided that he could not lift more than

five pounds with his left arm, rendered him unable to perform the essential functions of his work.[7]

The Court finds that Lieffring has raised a genuine factual dispute regarding whether he could perform his duties despite his lifting restrictions. It is undisputed that the ability to lift thirty-five pounds is an essential requirement for Prairieland Production Workers. (*See* Lieffring Dep. at 31-32; Myers Decl., Ex. 12.) It is also undisputed that, as of February 28, 2018, Lieffring was restricted to lifting only five pounds. (*See* Georgopoulos Decl., Ex. 35.) However, that restriction applied solely to Lieffring's left arm. (*Id.*) Defendants have not addressed that fact, and the record does not indicate that Lieffring could not meet the position's lifting requirements using his right arm. Indeed, both Lieffring and his immediate supervisor testified that Lieffring could have returned to work despite the February 28 restrictions. (Lieffring Dep. at 86-89; Langvardt Dep. at 50-61.) Director Rabbe admitted that she made no effort to discuss Lieffring's restrictions with him or to accommodate those restrictions, and instead insisted—without any explanation apparent on this record—that he could not return to work "until he's 100 percent." (Rabbe Dep. at 176; Langvardt Dep. at 60.) In light of that testimony, the Court finds that a genuine factual dispute exists regarding Lieffring's ability to perform the essential functions of his job.

---

[7] Although the February 28 restrictions included many other terms, including restrictions on Lieffring's ability to squat, bend, climb, and reach with his left arm, Defendants focus solely on Lieffring's five-pound lifting restriction. (*See* Georgopoulos Decl., Ex. 35.) Because Defendants have not argued that the other restrictions touch on essential functions of Lieffring's job, the Court focuses its analysis on the lifting restriction.

Accordingly, the Court denies Defendants' Motion for Summary Judgment on Lieffring's ADA and MHRA claims.

### 3.    WCA Obstruction and Retaliation Claims

Finally, the Court considers Defendants' challenge to Lieffring's WCA claims. Lieffring asserts both an obstruction and a retaliation claim under the WCA. *See* Minn. Stat. § 176.82, subd. 1 ("Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages . . . ."). Specifically, Lieffring alleges that Defendants obstructed his efforts to obtain workers' compensation benefits by sending misleading photographs of the accident site to the workers' compensation insurer, and that Defendants took adverse actions against him in retaliation for his workers' compensation claim. Defendants' motion does not address Lieffring's obstruction claim.

With respect to Lieffring's retaliation claim, Defendants argue that Lieffring has not shown a causal connection between the alleged adverse actions and his protected activity. "A workers' compensation retaliation claim is generally analyzed under the *McDonnell Douglas* burden-shifting test." *Tomlinson v. J.B. Hunt Transp., Inc.*, 989 F. Supp. 2d 766, 777 (D. Minn. 2013) (citing *Randall v. N. Milk Prods., Inc.*, 519 N.W.2d 456, 459 (Minn. Ct. App. 1994)). Under Minnesota law, "[a] prima facie case of retaliatory discharge . . . consists of: (1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Kunferman v. Ford Motor Co.*, 112 F.3d 962, 965 (8th Cir. 1997). Defendants do not

contest the first two elements of Lieffring's prima facie case, and instead focus their motion exclusively on the causation element. (Mem. in Supp. of Mot. for Summ. J. [Doc. No. 29], at 39.)

Lieffring argues that a triable issue exists on causation because Director Rabbe met with the Prairieland Board to discuss terminating him shortly after his accident and the filing of his workers' compensation claim; and after the Board voted to terminate him, Rabbe suspended him for two weeks, prevented him from returning to work until his accrued sick and vacation leave was exhausted, and then terminated him upon the exhaustion of his leave benefits. To be sure, "[t]iming alone cannot establish retaliatory intent." *Kunferman*, 112 F.3d at 965 (citation omitted). Rather, in order to overcome a motion for summary judgment, "[a]n employee must establish the employer's knowledge of protected activity." *Id.* (citation omitted). But it is undisputed that Rabbe informed the Prairieland Board of Lieffring's workplace injury, and the Board then voted to terminate Lieffring. (Rabbe Dep. at 160.) Although Defendants argue that Lieffring was ultimately terminated because he exhausted his accrued leave and failed to return to work, Lieffring has presented evidence that he was willing and able to return, and Prairieland's refusal to permit him to return was the product of unlawful discrimination and retaliation.[8] *See supra*

---

[8] Notably, Director Rabbe's concerns with Lieffring's performance—which allegedly led her to seek guidance from the Prairieland Board regarding his termination—were not even mentioned in the separation letter sent to Lieffring. *See* Rabbe Dep. at 157-60; Myers Decl., Ex. 30; *cf. Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 957 (8th Cir. 2012) (noting that, under the *McDonnel-Douglas* framework, substantial shifts in an employer's proffered non-discriminatory explanation for its actions may suggest that the explanation is pretextual).

Section II.B.2. On this record, a reasonable jury could find a sufficient causal nexus between the alleged adverse actions and Lieffring's protected activity, supporting a prima facie case of workers' compensation retaliation.

Accordingly, the Court denies Defendants' Motion for Summary Judgment on Lieffring's WCA claims.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 27] is **DENIED**.

**IT IS SO ORDERED.**

Dated: June 30, 2021                              s/Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge